**KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS, LLP**
200 West 41st Street, 17th Floor
New York, New York 10036
Telephone: (212) 972-3000
Facsimile: (212) 972-2245
Fred Stevens
Brendan M. Scott
Kathleen M. Aiello

*Special Litigation Counsel to Plaintiff Yann
   Geron, Chapter 7 Trustee*

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK**

---------------------------------------------------------x
In re                                                  :
                                                       :        Chapter 7
JAR 259 FOOD CORP.,                                    :
                                                       :        Case No. 22-40304 (JMM)
                          Debtor.                      :
---------------------------------------------------------x
YANN GERON, as Chapter 7 Trustee of                    :
Jar 259 Food Corp.,                                    :
                                                       :
                          Plaintiff,                   :
                                                       :
             -against-                                 :        Adv. Pro. No. 24-____(JMM)
                                                       :
                                                       :
ACCUFAST HOLDINGS, LLC d/b/a/                          :
SECURITY TITLE SERVICES, CATALYST                      :
BUSINESS PARTNERS LLC, NARINDER                        :
SINGH GAHRA, PRITAM KAUR,                              :
KAMLESH C. MEHTA FAMILY LLC,                           :
KAMLESH MEHTA a/k/a KAMLESH C.                         :
METTA, PARK HILLSIDE REALTY, LLC,                      :
PK BUSINESS CAPITAL INC.,                              :
JAGADEESAN V. POOLA and SILVER                         :
STAR FOODS, INC.,                                      :
                                                       :
                          Defendants.                  :
---------------------------------------------------------x

**COMPLAINT OF PLAINTIFF/TRUSTEE AGAINST (1) ACCUFAST HOLDINGS, LLC D/B/A SECURITY TITLE SERVICES, (2) CATALYST BUSINESS PARTNERS LLC, (3) NARINDER SINGH GAHRA, (4) PRITAM KAUR, (5) KAMLESH C. MEHTA FAMILY LLC, (6) KAMLESH MEHTA a/k/a KAMLESH C. METTA, (7) PARK HILLSIDE REALTY LLC, (8) PK BUSINESS CAPITAL INC., (9) JAGADEESAN V. POOLA, AND (10) SILVER STAR FOODS, INC., SEEKING ENTRY OF ONE OR MORE JUDGMENT(S) FOR DAMAGES ARISING FROM (I) AVOIDANCE OF PREFERENTIAL TRANSFERS PURSUANT TO 11 U.S.C. § 547, 550; (II) AVOIDANCE OF CONSTRUCTIVE AND INTENTIONAL FRAUDULENT CONVEYANCES PURSUANT TO 11 U.S.C. §§ 544, 548, 550; NYDCL §§ 272 – 279; (III) RECOVERY OF TRANSFERS FROM ONE OR MORE DEFENDANTS AS SUBSEQUENT TRANSFEREES; (IV) UNJUST ENRICHMENT; AND (V) DISALLOWANCE OF CLAIMS PURSUANT TO 11 U.S.C. § 502**

Yann Geron (the "Trustee" or "Plaintiff"), as the chapter 7 trustee of the estate of Jar 259 Food Corp., the above-captioned debtor (the "Debtor"), by and through his undersigned special litigation counsel, Klestadt Winters Jureller Southard & Stevens, LLP, hereby files this complaint (the "Complaint") against the following defendants: (1) Accufast Holdings, LLC d/b/a Security Title Services ("Security Title"); (2) Catalyst Business Partners LLC ("Catalyst Business"); (3) Narinder Singh Gahra ("Narinder"); (4) Pritam Kaur ("Pritam"); (5) Kamlesh C. Mehta Family LLC ("KCM Family"); (6) Kamlesh Mehta a/k/a Kamlesh C. Metta ("Mehta"); (7) Park Hillside Realty LLC ("Park Hillside"); (8) PK Business Capital Inc. ("PK Business"); (9) Jagadeesan v. Poola ("Poola"); and (10) Silver Star Foods, Inc. ("Silver Star") (each a "Defendant" and collectively, the "Defendants"), seeking a judgment against one or more of the Defendants to: (i) avoid and recover preferential transfers pursuant to 11 U.S.C. §§ 547 and 550; (ii) avoid and recover intentional and constructive fraudulent conveyances pursuant to 11 U.S.C. §§ 544, 548 and 550 and New York Debtor and Creditor Law ("DCL") §§ 272 - 279; (iii) recover certain transfers from one or more of the Defendants as subsequent transferees, pursuant to 11 U.S.C. §§ 550, 551; (iv) compel the disgorgement of any sums by which the Defendants have been unjustly enriched; (v) disallow any claims asserted, or that may be asserted, by Defendants against the

Debtor's estate pursuant to 11 U.S.C. § 502; and (vi) related relief, including the payment of attorneys' fees and costs, alleges as follows:

## PRELIMINARY STATEMENT

The Debtor, a grocery and food retail store in Glen Oaks, New York, was incorporated in or around September 11, 2015.  In or around 2018, Amandeep Singh ("Singh") and his wife, Kuljit Kaur ("Kuljit" and together with Singh, the "Principals"), purchased the Debtor from unrelated parties purportedly with the intention of continuing to operate the Debtor's grocery and food retail business.  During the time period relevant to this Complaint, the Principals owned and operated at least 16 other affiliated companies ("Debtor Affiliates")[1], which operated, and in some cases continue to operate, stores similar to the Debtor's store in New York City and the areas surrounding it.  With respect to certain of the Debtor Affiliates, the Principals produced or supplied food and beverage products within the same geographic region as the Debtor.

The Principals owned, managed and operated the Debtor during a four-year period prior to the Petition Date.  During that time, the Debtor, by and through the Principals, moved a substantial amount of money between the Debtor and the Debtor Affiliates, which resulted in a negative net effect for the Debtor who was significantly harmed as a result of the Principals' actions.  The Debtor transferred considerable sums of money to the Debtor Affiliates, "insiders' of the Debtor and third parties, without any cognizable benefit to the Debtor. The Debtor, by and through the Principals, did this not only to prop up the Debtor Affiliates rather than the Debtor, but also to

---

[1] The Debtor's Affiliates include, but may not be limited to, 101 Kaur Farms, Inc., 3350 Kaur Farms, Inc., 351 VS Kaur Farms, Inc., A & A Vegetables, Inc., A & S Vegetables, Inc. (d/b/a Food Universe Marketplace), Ameet Food Inc., Ameet Properties LLC, AnS Vegetable, Inc., Evolution Management Corp., Kaur Farms, Inc., Lakeville Farms LLC, VSL Farms Inc., OM Liquors, Inc. and OM Vegetable, Inc.

place the Debtor's monies outside the reach of its creditors but still within the control and benefit of the Principals.

As the Debtor moved more money out of its accounts and into those of the Debtor Affiliates and "insiders" while the Principals retained some amount of control over those funds, the Debtor became increasingly financially distressed and required to take on more loans to continue operating the Debtor. During the approximately four-year period in which the Principals operated the Debtor's business, the Debtor incurred a staggering amount of debt, including *inter alia* a secured obligation to Key Food (later defined) which the Debtor incurred prior to the Principals' ownership. However, as the Debtor encountered mounting economic pressures and a deteriorating financing condition, in the approximately four (4) months between mid-October 2021 and the Petition Date, the Debtor acquired an additional $14.2 million in obligations by entering into at least 31 merchant cash advance agreements with at least 24 merchant cash advance entities (collectively, the "MCA Companies"), in which the MCA Companies purported to offer merchant cash advances in exchange for a portion of the Debtor's future receivables. All the while, the Debtor continued to move money, including the monies from the MCA Companies, Key Food and the SBA (later defined and discussed herein) and others to the Debtor Affiliates and "insiders". In many instances, the Debtor, either on behalf of itself or in collaboration with Debtor Affiliates and certain of the Defendants, opened new bank accounts to move money out of the reach of its creditors and into accounts not previously disclosed to those creditors.

In or around November 2021, a few short months before the Petition Date when the Debtor not only owed money to Key Food and acquired an additional $14.2 million in obligations to the MCA Companies, among other creditors (later discussed), the United States Small Business

Administration (the "SBA") advanced no less than $2 million[2] in new loans to the Debtor. Rather than using the proceeds of the SBA Loan (later defined) as working capital to alleviate economic injury caused by the disaster occurring in the month of January 31, 2020 (*i.e.,* the COVID-19 Pandemic) as the Debtor expressly pledged to do in the SBA loan agreement, the Debtor immediately transferred the proceeds of the SBA Loan from the Debtor to the Defendants, most of whom are "insiders" of the Debtor and other Debtor Affiliates as initial or subsequent transferees. Almost immediately after each tranche of the SBA Loan proceeds was deposited into the Debtor's account(s), the Debtor, by and through its Principals, transferred a substantial portion of the SBA Loan proceeds and other advances to either: (a) related parties and family members (*i.e.,* Narinder and Pritam); (b) the Debtor Affiliates; or (c) third parties (collectively, the "Transferees"), without any or at least fair consideration given to the Debtor in return. What is worse, the Debtor's movement of the loan proceeds from its own accounts to those Transferees not only made those funds unavailable for the Debtor's use in sustaining its business or overcoming its financial distress, the stated purpose for the Debtor obtaining the loans and other advances, but it also placed the funds outside of the reach of the Debtor's creditors making the Debtor nearly judgment proof and unable to satisfy its own obligations.

By this Complaint, the Trustee seeks to recover the entire value of the SBA Loan proceeds, along with other transfers made by the Debtor to the Defendants, which were intended for the Debtor but which the Debtor's Principals immediately transferred out of the Debtor's control for

---

[2] The first tranche of the SBA Loan in the amount of $499,900.00 (the "First SBA Deposit") was deposited with the Debtor on November 8, 2021. On that same day, November 8, 2021, the Debtor transferred nearly all of the first tranche of the SBA Loan proceeds ($415,000.00) to Debtor Affiliate, OM Liquors, Inc., which subsequently transferred $397,500.00 of the first transfer to another Debtor Affiliate, VLS Farms. Over the next two (2) months, VLS Farms then transferred those funds to a number of other Debtor Affiliates, in various amounts to other Debtor Affiliates and what appears to be other of the Principals' family members. These transfers will be the subject of a separate complaint.

the benefit of the Principals, their family members and the Debtor Affiliates – depriving the Debtor of its ability to maintain its operations and sustain its business, but more importantly, robbing the Debtor's creditors of its prospects of recovering the monies which they are owed.  The Trustee now seeks to do that for the benefit of the Debtor's estate and its creditors.

## **INTRODUCTION**

1.      On February 18, 2022 (the "Petition Date"), the Debtor filed a voluntary petition for relief under subchapter V of chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of New York (this "Court").

2.      The Debtor elected to proceed under Subchapter V of Chapter 11.  Therefore, no official committee of unsecured creditors was appointed or established in this case.

3.      On February 22, 2022, the United States Trustee filed a *Notice Appointing Yann Geron as the Subchapter V Trustee* of the Debtor's case [ECF No. 3].

4.      The Debtor continued to operate its business and manage its property as a debtor in possession pursuant to 11 U.S.C. §§ 1107(a) and 1108 from the Petition date until September 29, 2022, when this Court entered the *Order Granting Motion to Convert Case to Chapter 7* (the "Conversion Order")[3] [ECF No. 210].

5.      On the Petition Date, the Debtor filed its bankruptcy schedules (the "Schedules") and Statement of Financial Affairs (the "SOFA") [ECF No. 1].

6.      On July 19, 2022, the Debtor filed Amended Schedules (the "Amended Schedules") [ECF No. 120].

---

[3] The Conversion Order granted The LCF Group Inc.'s motion, seeking the entry of an order: (I) pursuant to sections 105(a) and 1112(b) of the Bankruptcy Code and Rules 1017(f) and 9014 of the Federal Rules of Bankruptcy Procedure, converting the Debtor's case from a case under Chapter 11 to a case under Chapter 7 of the Bankruptcy Code; and (II) granting such other and further relief as the Court deems just and proper (the "Conversion Motion") [ECF No. 81].

7.      On August 18, 2022, the Debtor filed an Amended SOFA (the "Amended SOFA") [ECF No. 136].

8.      On October 3, 2022, Yann Geron was appointed as the Chapter 7 Trustee of the Debtor's estate [ECF No. 211].

9.      On November 3, 2022, the Trustee presided over the meeting of creditors pursuant to 11 U.S.C. § 341 (the "341 Meeting") and became the permanent Trustee.

## BASIS FOR RELIEF

10.     This adversary proceeding (the "Adversary Proceeding") is brought to recover certain transfers of money or property of the Debtor (collectively, the "Transfers") in addition to damages on the account of: (i) the avoidance and recovery of preferential transfers pursuant to 11 U.S.C. §§ 547 and 550; (ii) the avoidance and recovery of intentional and constructive fraudulent conveyances pursuant to 11 U.S.C. §§ 544, 548 and 550; (iii) the recovery of certain transfers from one or more of the Defendants as subsequent transferees, pursuant to 11 U.S.C. §§ 550, 551; (iv) compelling the disgorgement of any sums by which the Defendants have been unjustly enriched; (v) disallowing any claims asserted, or that may be asserted, by Defendants against the Debtor's estate pursuant to 11 U.S.C. § 502; and (vi) related relief, including the payment of attorneys' fees and costs.

## JURISDICTION

11.     This Adversary Proceeding relates to the bankruptcy case of *In re Jar 259 Food Corp.,* Debtor, Case No. 22-40304 (Bankr. E.D.N.Y. Feb. 18, 2022) (the "Bankruptcy Case"), which is pending under chapter 7 of the Bankruptcy Code in this Court before the Honorable Jil Mazer-Marino, United States Bankruptcy Judge.

12.     This Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334, Administrative Order No. 264 titled "*In the Matter of The Referral of Matters to the Bankruptcy Judges*" of the United States District Court for the Eastern District of New York (Weinstein, C.J.), dated August 28, 1986, and Administrative Order No. 601 of the United States District Court for the Eastern District of New York (Amon, C.J.), dated December 5, 2012.

13.     Plaintiff consents to entry of final orders or judgments by the Bankruptcy Court with respect to all claims raised by this Complaint.

14.     Venue of this Adversary Proceeding is proper pursuant to 28 U.S.C. §§ 1408 and 1409 because it arises in a case under the Bankruptcy Code pending in this district.

## PARTIES

15.     Yann Geron is a member of the panel of private Chapter 7 trustees established by the United States Trustee pursuant to 28 U.S.C. § 586(a)(1).  The Trustee is the permanent Chapter 7 trustee of the Debtor and its bankruptcy estate and is empowered to bring this Adversary Proceeding.  The Trustee maintains an address for the conduct of business at 370 Lexington Avenue, Suite 1101, New York, New York 10017.

16.     As of the Petition Date and prior to the Conversion Date, the Debtor was a New York corporation which was incorporated in the State of New York on September 11, 2015. During its operation and prior to the Petition Date, the Debtor maintained its principal place of business at 259-01 Union Turnpike, Floral Park, New York 11004 or 259-11 Union Turnpike, Glen Oaks, New York 11004.  The Debtor's registered agent for service of process is listed as NHP Business Management Services, Inc. located at 229 Jericho Turnpike, New Hyde Park, New York 11040.

17.     Prior to the Petition Date, Kuljit was the President and principal of the Debtor with a 90% ownership interest therein.

18.     Prior to the Petition Date, Singh was the Vice President and principal of the Debtor with a 10% ownership interest therein.

19.     Defendant Accufast Holdings LLC, d/b/a Security Title, is a domestic limited liability company registered in the State of Indiana, which maintains a principal place of business at 9225 Priority Way West Drive, Indianapolis, Indiana 46240-1573 and an address for service of process c/o Dean Lopez, 650 N. Rangeline Rd., Carmel, Indiana 46032.

20.     Defendant Catalyst Business is a domestic limited liability company registered in the State of Arizona, which maintains a principal place of business and an address for service of process at 8324 N. 9th Avenue, Phoenix, Arizona 85021-5536.

21.     Defendant Narinder is Singh's father.

22.     Upon information and belief, Defendant Narinder does not have an ownership interest in the Debtor nor he is employed by the Debtor.

23.     Upon information and belief, Defendant Narinder is listed as an officer of one or more of the Debtor's Affiliates, including but not limited to having identified himself as the Chief Operating Officer of OM Vegetable, Inc. ("OM Vegetable").

24.     Defendant Narinder is an "insider" of the Debtor as that term is defined under 11 U.S.C. § 101(31)(B)(vi) because he is a relative of Singh, a director, officer and person in control of the Debtor.

25.     Defendant Narinder is a resident of the State of New York who, upon information and belief, maintains his residence at 46 Alling Street, Hicksville, New York 11801.

26.     Upon information and belief, Defendant Narinder resides in the same home as the Debtor's Principals.

27.     Defendant Pritam is Singh's mother.

28.     Upon information and belief, Defendant Pritam does not have an ownership interest in, nor is she employed by, the Debtor.

29.     Defendant Pritam is an "insider" of the Debtor as that term is defined under 11 U.S.C. § 101(31)(B)(vi) because she is a relative of Singh, a director, officer and person in control of the Debtor.

30.     Defendant Pritam is a resident of the State of New York who, upon information and belief, maintains her residence at 46 Alling Street, Hicksville, New York 11801.

31.     Upon information and belief, Defendant Pritam resides in the same home as the Debtor's Principals.

32.     Defendant KCM Family is a domestic limited liability company formed on November 21, 2011 and registered in the State of New York.  Defendant KCM Family maintains its principal place of business and an address for service of process care of Arjit Mehta, 22 Hemingway Drive, Dix Hills, New York 11746.

33.     Defendant Mehta is an individual resident of the State of New York who, upon information and belief, maintains an address at 226 Brookville Road, Glen Head, New York 11545 or P.O. Box 784, Hicksville, New York 11802.

34.     Defendant Park Hillside is a domestic limited liability company registered in the State of New York, which maintains a principal place of business at 150 Great Neck Road, Suite 304, Great Neck, New York 11021 and an address for service of process at c/o Igal Namidar, 150 Great Neck Road, Suite 304, Great Neck, New York 11021.

35.    Defendant PK Business is a domestic corporation registered in the State of New York, which maintains an address for service of process c/o The Corporation, 320 Post Avenue, Suite 307, Westbury, New York 11590.

36.    Defendant PK Business is an "insider" of the Debtor as that term is defined under 11 U.S.C. § 101(31)(B)(vi) because it is an affiliated business entity owned by one or more "insiders" of the Debtor.

37.    Defendant Poola is an individual resident of the State of New York who maintains an address at 7 Park Drive East, Old Westbury, New York 11568.

38.    Defendant Silver Star is a domestic corporation registered in the State of North Carolina, which maintains a principal place of business at 6000 Fairview Rd., Suite 1200, Charlotte, North Carolina 28210 and an address for service of process c/o Registered Agents, Inc., 4030 Wake Forest Road, Ste. 349, Raleigh, North Carolina 27609.

<u>**FACTS COMMON TO ALL CAUSES OF ACTION**</u>

39.    The Debtor is a New York corporation which was incorporated on or around September 11, 2015.

40.    Prior to the Petition Date, the Debtor owned and operated a grocery and food retail store located at 259-11 Union Turnpike, Glen Oaks, New York 11004.

41.    Prior to the Petition Date, Kuljit was the President and principal of the Debtor with a 90% ownership interest therein.

42.    Prior to the Petition Date, Singh was the Vice President and principal of the Debtor with a 10% ownership interest therein.

43.    According to Singh, during the approximately seven years of its operations, the Debtor's store was a "vibrant neighborhood market emphasizing an extensive selection of fresh,

naturel [*sic*], and organic products, prepared foods, and hard-to-find specialty and gourmet offerings, along with a full assortment of conventional groceries." *See Rule 1007-4 Declaration of Amandeep Singh* (the "<u>First Singh Declaration</u>") [Case No. 22-40304; ECF No. 2 at ¶ 10].

44.    Upon information and belief, the Debtor employed approximately 46 employees at its store, some of which were represented by Local 338 RWDSU/UFCW (the "<u>Union</u>"). *See* First Singh Declaration at ¶ 4.

45.    Singh also testified before this Court that he has ownership interests in and operates several other grocery stores throughout Long Island, New York.  During the Debtor's Chapter 11 proceeding, several creditors raised serious concerns about potential intercompany transfers that might have occurred between the Debtor and certain non-Debtor Affiliates, including those owned and controlled by the Debtor's Principals.

46.    Almost instantly after the Principals gained control of the Debtor in 2018, they began initiating frequent and sizeable transfers of money and property from the Debtor to the Debtor Affiliates.

47.    The consideration received by the Debtor from the Debtor Affiliates in exchange for those transfers was not nearly commensurate with the amount of Debtor monies paid to the Debtor Affiliates.

48.    More specifically, following Singh's takeover of the Debtor and until the Petition Date, and in several instances following the Petition Date, the Debtor transferred in excess of $15.5 million to the Debtor Affiliates and other "insiders" of the Debtor, including Singh's parents, Narinder Singh Gahra and Pritam Kaur.

49.    The staggering amount of funds that left the Debtor, at the direction of the Principals, depleted the Debtor and left it unable to operate, let alone to satisfy its debts.

50.    The Principals used the Debtor as their own personal piggy bank, moving funds between the Debtor and Debtor Affiliates, their friends and family and themselves without any regard for the commitments made to their creditors and without any hope of sustaining a viable business.

51.    Importantly, the Debtor's 2020 tax return did not reflect any amounts owed to the Debtor by the Debtor Affiliates. There was no evidence of intercompany loan transactions, accounting entries or loan documentation that would suggest the Debtor, the Debtor Affiliates or the Principals observed corporate formalities, let alone acknowledged any kind of obligation to recover the monies transferred to the Debtor Affiliates for the benefit of the Debtor and its creditors.

### a.    The Debtor's Financial History, Distress and Mounting Debt Precipitating the Bankruptcy Filing

#### 1.    *Economic Challenges Preceding the Petition Date*

52.    Since its incorporation in 2015, the Debtor had limited assets, consisting of: (1) inventory, the value of which the Debtor estimated to be $20,000 as of the Petition Date; (2) at least nine (9) known pre-petition bank accounts, only five of which were disclosed by the Debtor on its bankruptcy schedules, holding approximately $433,534.46 in the aggregate as of the Petition Date; (3) a lease for the Debtor's store which was turned over to its lender, Key Food Stores Co-Operative, Inc. ("Key Food"), prior to the Petition Date; (4) litigation claims, utility deposits, accounts receivable and other assets for which the Debtor did not ascribe a monetary value. *See* Amended Schedules filed on July 19, 2022 [ECF No. 120].

53.    Since on or around October 2015, the Debtor had a Membership Agreement (the "Key Food Management Agreement") with Key Food. In connection with that Membership Agreement, the Debtor executed a promissory note, upon which it later defaulted, as well as a

confession of judgment in favor of Key Food.  Consequently, Key Food is a secured creditor of the Debtor.

54.    In early 2018, when the Debtor was still owned by the predecessor and before the Principals assumed management of the Debtor, Key Food, NewBank ("NewBank") and the Debtor entered into an agreement, dated February 15, 2018, whereby $2.4 million of the debt owed by the Debtor to Key Food would be converted into a loan from NewBank to the Debtor (the "Intercreditor Agreement").

55.    Upon information and belief, the Principals purchased their respective ownership interest in the Debtor in 2018.

56.    At the time the Principals acquired the Debtor's business, the Debtor was already burdened with substantial debt, including those owed to Key Food and the amounts due to NewBank pursuant to the Intercreditor Agreement, which totaled approximately $2.3 million.

57.    These debts were not the Debtor's only obligations at that time.

58.    From the date the Principals purchased the Debtor until the Petition Date, the Debtor's financial obligations only continued to grow.

59.    By October 2018, the Debtor became a defendant in an action pursued by Raymond Lugo ("Lugo") for tort claims based on personal injury purportedly sustained on the Debtor's property (the "Lugo Lawsuit").  The Lugo Lawsuit continued until November 2022, after the Debtor's case was converted, when the parties stipulated to its dismissal.  Lugo remained a creditor of the Debtor during the entire length of the Lugo Lawsuit, which overlaps with the transfers the Trustee seeks to recover herein.

60.    In November 2018, Singh, on behalf of Defendant A & S Vegetables and Defendant OM Vegetable, signed their own membership agreements with Key Food (the "<u>Key Food Debtor Affiliate Membership Agreement</u>").

61.    As part of the Key Food Debtor Affiliate Membership Agreement, the Debtor, by and through Singh, signed a cross corporate guaranty (the "<u>Key Food Cross-Corporate Guaranty</u>"), providing additional security to Key Food to or for the benefit of Defendant A & S Vegetables and/or Defendant OM Vegetable.

62.    Singh signed the Key Food Cross-Corporate Guaranty as the President and Secretary for each of the Debtor, Defendant A & S Vegetables and Defendant OM Vegetable.

63.    The Key Food Debtor Affiliate Membership Agreement, increased the Debtor's obligations to Key Food, making the Debtor liable not only for its own obligations to Key Food, but also for those incurred by Defendant A & S Vegetables and Defendant OM Vegetable to Key Food.

### 2.  *Mounting Financial Pressures and New Debt Commitments*

64.    "Prior to Key Food's management of the Debtor's store [pre-March 2020] and the COVID-19 pandemic, the Debtor faced significant market pressures.  The Debtor was confronted with increasing competition from local, regional and national supermarket grocers as well as convenience stores and other independent and specialty food stores.  In recent years, the Debtor also saw increased competition from online retail grocery giants such as Amazon, Walmart and Target."  *See* First Singh Declaration at ¶ 22.

65.    Singh testified on or around the Petition Date that "[f]or several years, the Debtor has faced significant financial difficulties due to rising costs of produce and labor.  *See* Singh Declaration at ¶ 5; [Sept. 28, 2022 Hearing Transcript at p. 72:13-15].

66.     "In addition, the Debtor's workforce was largely unionized which resulted in increased labor costs compared to some of the Debtor's competition.  As a result, the Debtor's competitors could offer lower prices to their customers which created increased pricing pressures for the Debtor and reducing overall profits."  *See* First Singh Declaration at ¶ 23.

67.     In or around March 2020, the Debtor's primary supplier, Key Food, took over the operations of the Debtor's Store.

68.     Upon information and belief, from the time Key Food took over management of the Debtor's store in or around March 2020 and continuing through the COVID-19 pandemic and the Petition Date, the Debtor faced significant financial distress.

69.     In relevant part, the COVID-19 pandemic led to increased concern with in-person shopping and challenges with labor shortages, including employees deciding not to return to work and others unable to appear for shifts because of positive COVID-19 results.  *See* First Singh Declaration at ¶ 24.

70.     The cost of food and goods also dramatically increased in 2021 in large part due to supply chain issues, particularly for international food and goods involving suspensions, quotas and other governmental restrictions.  *See* First Singh Declaration at ¶ 25.

71.     Yet, despite the Debtor's admitted financial difficulties, deteriorating financial condition and mounting obligations during the four (4) years prior to the Petition Date when the Principals operated the company, the Principals, on behalf of the Debtor, made the precarious decision to incur new financial obligations in the form of new debt commitments, in addition to ones the Debtor already owed to Key Food, and other creditors.

72.     More specifically, between mid-October 2021 and the Petition Date, a period of approximately four (4) months, the Debtor acquired an additional $14.2 million in debt by entering

into at least 31merchant cash advance agreements with at least 24 merchant cash advance entities (the "MCA Companies").

73.    According to Singh, the Debtor "considered the advances provided by the MCA Companies as necessary to continue to operate the Debtor's business." *See* First Singh Declaration at ¶ 16.

74.    The MCA Companies intended to take, and in many instances did take, fixed, automatic withdrawals from the Debtor's accounts, which limited the Debtor's ability to operate, to meet its payroll obligations and generally caused the Debtor's liquidity issues. *See id.* at ¶¶ 16, 26.

**b.  The Debtor's SBA Loan Immediately Prior to its Bankruptcy Filing**

75.    On November 1 2021, the Debtor executed a note (the "Original Note") in favor of the United States Small Business Administration (the "SBA") in the amount of $500,000, which was set to mature on November 4, 2051, which was an Economic Injury Disaster Loan (the "SBA Loan").

76.    On November 8, 2021, in connection with the Original Note, the SBA deposited $499,900.00 in the Debtor's checking account maintained at BCB Bank ending in x0243 (the "First SBA Deposit"). *See Declaration of Amandeep Singh in Support of the Debtor's Objection to Application for Entry of an Order Scheduling a Hearing on Shortened Notice on Why an Order Should not be Entered (I) Granting Authority to the LCF Group Inc. to Commence Actions to Recover Assets for the Benefit of the Estate, (II) Directing the Immediate Turnover of Property of the Estate, or in the Alternative (III) Converting the Debtor's Case to One Under Chapter 7, and (IV) Granting Injunctive Relief*, filed on August 22, 2022 as ECF No. 154 (the "Second Singh Declaration") at ¶ 38, Ex. K.

77.     On December 2, 2021, the Debtor and the SBA entered into the first modification of the Original Note (the "Modified Note"), increasing the amount of the SBA Loan by $1,500,000 to a total loan of $2,000,000.  The maturity date remained the same in the Modified Note.

78.     Kuljit executed the SBA Loan documents on behalf of the Debtor.

79.     On December 29, 2021, in connection with the Modified Note, the SBA deposited an additional $1,500,000.00 in the Debtor's checking account maintained at BCB Bank ending in x0243 (the "Second SBA Deposit" and together with the First SBA Deposit, the "SBA Loan Proceeds").  *See* Second Singh Declaration at ¶ 41, Ex. L.

80.     As security for the SBA Loan, the Debtor pledged certain collateral to secure payment and performance of all debts, liabilities and obligations, which included all tangible and intangible property of the Debtor, including but not limited to, inventory, equipment, instruments, including promissory notes, heath care and credit card receivables, deposit accounts, commercial tort claims, etc., as more fully set forth in the SBA Loan agreement. *See* Claim #32 on the Debtor's Claims Register.  In addition, Kuljit personally guaranteed the SBA Loan.

81.     In the SBA Loan agreement, the Debtor specifically pledged to "use all the proceeds of this Loan solely as working capital to alleviate economic injury caused by the disaster occurring in the month of January 31, 2020 and continuing thereafter." *See id.*

82.     The Debtor further pledged to obtain and itemize receipts (paid receipts, paid invoices or cancelled checks) and contracts for all SBA Loan funds spent and to retain those receipts for three years from the final disbursement. *Id.*

83.     The Debtor further agreed that unless it had the prior written consent of the SBA, which upon information and belief was never obtained, it would not "make any distribution of Borrower's assets, or give any preferential treatment, make any advance, directly or indirectly, by

way of loan, gift, bonus, or otherwise, to any owner or partner or any of its employees, or to any company directly or indirectly controlled or affiliated with or controlled by Borrower, or any other company."

84.     The Debtor did not disclose the SBA Loan on its Schedules filed on the Petition Date; however, it amended its schedules to include the SBA Loan *five (5) months later*, indicating that the Debtor incurred a $2,000,000 liability on December 2, 2021. *See* Amended Schedules at 3.37.  The Debtor did not list the SBA Loan as contingent, liquidated or disputed.

85.     On August 15, 2022, the SBA filed proof of claim number 32 in the amount of $2,013,099.31 as a secured claim for "money loaned" to the Debtor (the "SBA Claim").

### c.   Debtor's Transfer of SBA Loan Proceeds and Other Property to the Defendants

#### 1.   *Debtor's Transfer of the First SBA Deposit to Debtor Affiliates*

86.     Immediately following receipt of the First SBA Deposit on November 8, 2021, *on the same day*, the Debtor transferred $415,000 of the $499,900 SBA Loan Proceeds deposited to OM Liquors, Inc. ("OM Liquors"), one of the Debtor's Affiliates, though Singh testified before this Court that the Debtor transferred the First SBA Deposit to a different Debtor Affiliate, VLS Farms, Inc. ("VLS Farms").  Upon information and belief, OM Liquors subsequently transferred a portion of the First SBA Deposit it received (*i.e.,* $397,500 of $415,000) to VLS Farms the following day.

87.     The Debtor's transfer of the proceeds of the First SBA Deposit are the subject of another complaint against the Debtor Affiliates, among other defendants, being pursued by the Trustee in connection with the Debtor's bankruptcy proceeding.

**2.  *Debtor's Transfer of the Second SBA Deposit to One or More Defendants as Initial or Subsequent Transferees***

88.  On December 29, 2021, the SBA deposited the second tranche of the SBA Loan in the amount of $1,500,000 (the "Second SBA Deposit") to the Debtor. On that same day, December 29, 2021, and a mere fifty-one (51) days before the Petition Date, the Debtor immediately transferred all $1.5 million of the SBA Loan proceeds to Singh's father, Narinder (the "SBA Loan Transfer to Narinder"), which were deposited in his account ending in x0603 at BCB Community Bank (the "Gahra Bank Account").[4]

89.  On January 7, 2022, Narinder made two (2) separate withdrawals from the Gahra Bank Account, totaling $1.4 million, nearly the entire amount of the SBA Loan Transfer to Narinder.

90.  Narinder subsequently made a series of withdrawals and subsequent transfers to his wife and various other closely related friends or contacts, which were, upon information and belief, made at the direction of Singh.

**a.  Narinder's Subsequent Transfers to KCM Family**

91.  On January 7, 2022, for reasons that are not apparent in the Debtor's books and records, Narinder caused $200,000 to be withdrawn from the Gahra Bank Account in the form of two (2) cashier's checks each in the amount of $100,000 and made payable to the KCM Family. However, on or around January 20, 2022, Narinder re-deposited one of the two (2) cashier's checks made payable to "Kamlesh C Mehta Family" into the Gahra Bank Account, making the amount received by KCM Family $100,000 (the "Narinder Subsequent Transfer to KCM Family").  The

---

[4] Narinder opened the Gahra Bank Account on December 2, 2021. Aside from the initial $160.00 deposit required to open the account, the $1.5 million transfer was the only funds on deposit at the time.

second cashier's check made payable to the KCM Family was re-deposited in the Gahra Bank Account.

92.     By Singh's own admission, he directed the first withdrawal on January 7, 2022 of $200,000 (*i.e.*, the Narinder Subsequent Transfer to KCM Family) from the Gahra Bank Account to be "used to pay a debt owed to Kamlesh C. Metta [Mehta] for repayment of a loan," because he was "concerned the MCA Companies may begin to attach [to] the Gahra Bank Account." *See* Second Singh Declaration at ¶¶ 43-44.

93.     However, in the Second Singh Declaration, Singh failed to specify who owed KCM Family for repayment of a loan or any of the terms associated therewith, or why either Defendant was entitled to the SBA Loan Transfer to KCM Family (later defined).

94.     Upon information and belief, the Debtor did not have a loan obligation to KCM Family or Mehta.

95.     Neither the Debtor's Schedules [ECF No. 1], nor the Debtor's Amended Schedules [ECF No. 136], filed six (6) months after the original schedules were filed, listed either KCM Family or Mehta as creditors of the Debtor, nor do they make any mention of either of those Defendants for any purpose.

96.     In addition, prior to the SBA Loan Transfer to KCM Family, the Debtor had made a series of seventeen (17) transfers from November 26, 2018 through December 4, 2019, totaling $604,100, to KCM Family (collectively, the "KCM Family Fraudulent Transfers").

97.     The reason or justification for the KCM Family Fraudulent Transfers is also not clear from the Debtor's books and records.

98.     Upon information and belief, the purpose of the Narinder Subsequent Transfer to KCM Family was to keep the proceeds of the SBA Loan out of the reach of Key Food, the MCA

Companies and other creditors, rather than to satisfy the Debtor's debts as Singh boldly represented to the Bankruptcy Court. *See* Second Singh Declaration at ¶¶ 43-44.

99.     Similarly, the purpose of the 2018-2019 KCM Family Transfers was to keep the Debtor's monies out of the reach of its creditors, including but not limited to Key Food.

### b.  Narinder's Subsequent Transfers to Pritam

100.    On January 7, 2022, Narinder caused a second withdrawal of $1,200,000 from the Gahra Bank Account in the form of two (2) cashier's checks each in the amount $600,000, which were made payable to his wife and Singh's mother, Pritam.  This comprised nearly the entire balance of the SBA Loan Transfer to Narinder then remaining in the Gahra Bank Account.

101.    Upon information and belief, following Narinder's January 7, 2022 withdrawal of $1.2 million from the Gahra Bank Account, $100,000 of the SBA Loan Transfer to Narinder, remained in the Gahra Bank Account.

102.    Of the $1.2 million withdrawn by Narinder from the Gahra Bank Account on January 7, 2022:

- the first $600,000 cashier's check was paid to Pritam (the "Narinder Subsequent Transfer to Pritam"), and deposited in her account ending in x9122 at JP Morgan Chase (the "Pritam Chase Account"[5] on January 20, 2022; and

- Narinder retained the second $600,000 cashier's check made payable to Pritam and later re-deposited it into the Gahra Bank Account.[6]

---

[5] Pritam appears to have opened the Pritam Chase Account on or around January 6, 2022, with an opening deposit of $440,000 received from Debtor Affiliate, VLS Farms, Inc.  The transfer from VLS Farms, Inc. was comprised of an aggregation of funds from certain other Debtor Affiliates, including: (i) $190,500 from OM Vegetable, Inc.; (ii) $150,000 from OM Liquor, Inc.; and (iii) $150,500 from A&A Vegetable, Inc., all of which were funded by various MCA Companies (later defined).

[6] Of the initial $1.5 million of the Second SBA Deposit transferred from the Debtor, Narinder retained: (1) $100,000 from the initial transfer, which he never withdrew; (2) re-deposited the second cashier's check for $100,000 made payable to the KCM Family into the Gahra Bank Account; (3) re-deposited the second cashier's check for $600,000 made payable to Pritam into the Gahra Bank Account; and (4) $408,500 in transfers from Pritam to Narinder, totaling $1,208,500 (collectively, the "Narinder Retained Monies").

103.     According to Singh, he had, or directed Narinder to have, two (2) certified checks, each for $600,000, drawn from the Gahra Bank Account because he was "concerned the MCA Companies might begin to attach [to] the Gahra Bank Account." *See* Second Singh Declaration at ¶ 44.

104.     Upon information and belief, the balance of the second withdrawal, in the amount of at least $600,000 (*i.e.*, the Narinder Subsequent Transfer to Pritam), was subsequently transferred by Narinder to Pritam purportedly to "use for the expenses of the Debtor and affiliates of the Debtor." *See* Second Singh Declaration at ¶ 45.

105.     Upon information and belief, following Narinder's January 7, 2022 withdrawals from the Gahra Bank Account, Narinder remained in control of $700,000 of the original SBA Loan Transfer to Narinder (*i.e.* the Narinder Retained Loan Proceeds).

106.     Singh represented to the Court that Defendant Narinder retained one (1) of the certified checks, or $600,000 of the $1.2 million of SBA Loan Proceeds withdrawn on January 7, 2022 (the "Narinder Withdrawal"), for "loans that the Debtor and the affiliates received from my father." *See* Second Singh Declaration at ¶ 45.

107.     However, upon information and belief, the Debtor did not receive any transfers from Narinder during the Recovery Period.

108.     The Debtor's books and records do not show any reference to a loan from Narinder.

### c.   Narinder's Subsequent Transfers to Purported Third Parties

109.     Following the SBA Loan Transfer to Narinder, using the proceeds of the SBA Loan intended for the Debtor, Narinder transferred $50,000 to Silver Star (the "Narinder Silver Star Transfer").

110.     Following the SBA Loan Transfer to Narinder, using the proceeds of the SBA Loan intended for the Debtor, Narinder made a series of five (5) transfers between February 23, 2022 and March 14, 2022 to Park Hillside, totaling $226,295.18 (collectively, the "Narinder Park Hillside Transfers").

### d.  Pritam's Subsequent Transfers to Other Defendants

111.     Following Pritam's receipt of the Narinder Subsequent Transfer to Pritam, on or around January 20, 2022, Pritam deposited the $600,000 she received from Narinder into her personal bank account (*i.e.,* the Pritam Chase Account).[7]

112.     Within several days of receiving the Narinder Subsequent Transfer to Pritam, Pritam made a series of withdrawals and wire transfers transferring those and other funds held in the Pritam Chase Account to the following transferees on the following dates and in the following amounts:

> ➢  January 24, 2022 – Silver Star - $50,000 (the "Pritam Silver Star Transfer" and together with the Narinder Silver Star Transfer, the "Silver Star Transfers");

> ➢  January 26, 2022 – Withdrawal of $350,000, which was subsequently disbursed by cashiers' checks made payable to the following subsequent transferees:

>   • $200,000 payable to Poola (the "Pritam Transfer to Poola"); and
>   • $150,000 payable to White & Williams LLP, the Debtor's pre-conversion bankruptcy counsel presumably in payment of some or all of its retainer fee[8];

---

[7] At the time Pritam deposited the Narinder Subsequent Transfer to Pritam into the Pritam Chase Account, Pritam had funds on deposit from other sources, including Debtor Affiliate, VLS Farms, which was transferred on or around January 6, 2022, and not only the proceeds of SBA Loan, which were subsequently transferred to her.

[8] The Trustee has resolved his claims arising from this payment by settlement, which was recently approved by this Court.

➢ February 9, 2022 – Wire Transfer – Catalyst Business - $50,000 (the "Catalyst Transfer");

➢ February 9, 2022 – Wire Transfer – Debtor Affiliate, VLS Farms - $54,000; and

➢ February 11, 2022 – Transfer – Debtor Affiliate, VLS Farms - $21,000.

### e. Pritam's Subsequent Transfers Back to Narinder for Real Property Purchase Using SBA Loan Proceeds

113. In addition, between January 31, 2022 and March 15, 2022, Pritam made seven (7) transfers, totaling $408,500 back to Narinder.

114. On March 7, 2022, Narinder re-deposited the $600,000 he withdrew from the Gahra Bank Account on January 7, 2022, into the same.

115. In or around late February 2022, following the Debtor's bankruptcy filing, Pritam entered into a contract for the purchase of real property located at 3256 Waterside Ct., Greenwood, Indiana 46143 (the "Indiana Property") in the name of Pritam Kaur in the amount of $750,000, which was to be paid in all cash.

116. In the contract of sale for the Indiana Property, Pritam represented that she intended this property to be her primary residence.

117. Between February 17, 2022 and March 18, 2022, a combination of Narinder and Pritam, made four (4) transfers totaling $87,417 to PK Business (the "Subsequent Transfers to PK Business"), an entity owned and controlled by Pritam and/or Narinder, using funds which originated with the Debtor.

118. PK Business paid $10,000 and $132,958.46 on or around February 23, 2022 and March 7, 2022, respectively, to Security Title towards the purchase of the Indiana Property.

119. On March 7, 2022, Narinder re-deposited the Narinder Withdrawal into the Gahra Bank Account.

120.    On March 8, 2022, to fund the balance of the $750,000 purchase price of the Indiana Property, Narinder wired $600,000 from the Gahra Bank Account to Security Title via Stock Yards Bank & Trust (the "Security Title Transfer") for the purchase of the Indiana Property in Pritam's name.

121.    On March 11, 2022, Pritam closed on the purchase of the Indiana Property, which she still owns today.

122.    On June 20, 2023, Pritam listed the Indiana Property for sale; however, the Indiana Property did not appear to sell at the time it was originally listed and is no longer listed for sale.

### 3.    The Subsequent Transfers from Debtor Affiliates

123.     During the time period relevant to this Complaint, the Debtor also transferred significant amounts of its funds to certain of the Debtor Affiliates, including but not limited to A & S Vegetables Inc. d/b/a Food Universe Marketplace ("A & S Vegetables"), OM Liquors and OM Vegetable, Inc. ("OM Vegetable" and collectively, the "Debtor Affiliate Transferees") without any consideration to the Debtor and for the purpose of keeping the Debtor's monies out of the reach of its creditors (the "Debtor Affiliate Transfers").   The Debtor Affiliate Transfers are avoidable pursuant to 11 U.S.C. § 548(a)(1)(A), (B), 550 and 551 and other relevant provisions of the New York Debtor and Creditor law; and the Trustee is seeking to avoid same in a complaint that is being filed contemporaneously with this Complaint.

124.    More specifically, eight (8) transfers made to KCM Family between February 14, 2019 and January 29, 2020 totaling $99,500 by A & S Vegetable are directly traceable back to funds the Debtor paid to A & S Vegetable.

125.     Eight (8) transfers made to KCM Family between March 3, 2021 and January 4, 2022 totaling $197,000 by OM Vegetable are directly traceable back to funds the Debtor paid to OM Vegetable.

126.     In total, KCM Family received $296,500 (the "<u>KCM Family Debtor Affiliate Transfers</u>") in Debtor Affiliate Transfers from the Debtor Affiliates, all of which are traceable to Debtor funds.

127.     Upon information and belief, the Debtor was under no obligation to make any payments to KCM Family either directly or indirectly through one or more of the Debtor Affiliate Transferees.

128.     Three (3) transfers made to Park Hillside on September 10, 2021, November 17, 2021 and January 4, 2022, in the amounts of $20,040, $50,000 and $50,000 respectively, by OM Vegetable, are directly traceable back to funds the Debtor paid to OM Vegetable.

129.     One (1) transfer made to Park Hillside on September 6, 2022, after the Petition Date, in the amount of $25,000, by OM Liquors is directly traceable back to fund the Debtor paid to OM Liquors.

130.     In total, Park Hillside received $145,040 (the "<u>Park Hillside Debtor Affiliate Transfers</u>") in Debtor Affiliate Transfers from the Debtor Affiliates, all of which are traceable to Debtor funds.

131.     Upon information and belief, the Debtor was under no obligation to make any payments to Park Hillside either directly or indirectly through one or more of the Debtor Affiliate Transferees.

132.    Two (2) transfers made to Poola on February 11, 2020 and December 1, 2021 in the amounts of $25,000 and $12,500 respectively, by A & S Vegetables are directly traceable back to funds the Debtor paid to A & S Vegetables.

133.    Two (2) transfers made to Poola on March 22, 2021 and January 4, 2022 in the amounts of $10,000 and $200,000 respectively, by OM Vegetable, are directly traceable back to funds the Debtor paid to OM Vegetable.

134.    In total, Poola received $247,500 (the "Poola Debtor Affiliate Transfers") in Debtor Affiliate Transfers from the Debtor Affiliates, all of which are traceable to Debtor funds.

135.    Upon information and belief, the Debtor was under no obligation to make any payments to Poola either directly or indirectly through one or more of the Debtor Affiliate Transferees.

**4.    The Debtor's Frequent Transfer of Money to Debtor Affiliates, Insiders and Parties to which it had no Financial Obligation, Rendered the Debtor Insolvent and Came at the Expense of the Debtor's Creditors**

136.    As set forth above, the Principals owned several stores similar to the Debtor's store, located in the same geographic region, which they operated simultaneously with the Debtor.

137.    Throughout the entire period of the Principals' operation of the Debtor, the Debtor made frequent transfers of money or property to one or more of the Debtor Affiliates directly, or, alternatively, directly to one or more of the Debtor Affiliates' creditors, to which the Debtor had no obligation.

138.    The transfers of money from the Debtor to the Debtor Affiliates, other insiders, or creditors of the Debtor Affiliates, like the Defendants, was rampant between October 2018 and the Petition Date.  This resulted in the Debtor transferring millions of dollars of its own money away

from its own creditors either to prop up the Debtor Affiliates for the benefit of the Principals or other "insiders" of the Debtor, or to place those monies outside the reach of the Debtor's creditors.

139.    Yet, despite the frequency and amount of money transferred by the Debtor to the Debtor Affiliates and other "insiders", the Principals maintained control over nearly all the funds by and through the Debtor Affiliates, in which they had ownership interests and management positions, as well as through family and friends whom the Principals knew would facilitate the concealment of large sums of Debtor money from the Debtor's creditors.

140.    Either the Debtor failed to produce or did not maintain books and records documenting the Debtor's financial activity, or recording loan obligations or intercompany transfers. The Debtor's bank records proved to be the most reliable recording of the transfers at issue in this Complaint.

141.    Although the Debtor made significant transfers to Debtor Affiliates in 2020, the Debtor's 2020 tax return did not reflect any amounts owed by the Debtor Affiliates to the Debtor.

142.    By all accounts, the Debtor, by and through the Principals, sought to conceal the transfer of millions of dollars away from the Debtor to protect those monies for the benefit of the Debtor Affiliates or the Principals and to deprive its creditors of any recovery.

143.    In fact, the Debtor continued to make transfers to Defendant A & S Vegetables even after Defendant A & S Vegetables stopped operating its store in the fourth quarter of 2020.

144.     The Debtor had no purpose for transferring its funds to a non-operating Debtor Affiliate other than to give the appearance that such transfers had a legitimate business purpose when there was none. Importantly, by transferring the funds to a Debtor Affiliate, owned and controlled by the Principals, the Principals ensured that they retained possession of the monies, but left the Debtor's creditors without recourse to recover those monies from the Debtor.

145.    Upon information and belief, as the Debtor's debts increased, so too did the Debtor's transfer of monies out of the Debtor's bank accounts to, or for the benefit of, the Debtor Affiliates, "insiders" and Principals.

146.    In fact, the Debtor and the Debtor Affiliates owned, maintained and controlled at least seventy (70) identified bank accounts between and among the Debtor and Debtor Affiliates, thus facilitating the Debtor and Principals' efforts to conceal the monies from the proper creditors.

147.    Upon information and belief, it was the Debtor's pattern to open new bank accounts to receive transfers of money from the Debtor's existing bank accounts, of which its creditors were aware, to funnel money away from known sources of funds from which creditors might seek recovery from the Debtor. Once the Debtor began engaging with the MCA Companies, who were authorized by agreement with the Debtor to debit certain of the Debtor's bank accounts, the Debtor's pattern of opening new bank accounts to evade its creditors only increased.  The Debtor began to open new accounts that were not disclosed to the MCA Companies or other creditors in order to deplete the bank accounts designated in the agreements with the MCA Companies or otherwise to transfer money from the Debtor's accounts to the Debtor Affiliates or to their creditors directly.

148.    The Debtor also transferred substantial amounts of money to the Debtor Affiliates to cover certain of their bank overdraft charges, which inured to the benefit of both the Debtor Affiliates faced with the charges, as well as to the receiving banks, who are also Defendants in this Complaint.

149.    Despite Singh's claims that the Debtor needed the funds from the MCA Companies to operate the Debtor's business and Kuljit's commitment to the SBA not to "make any distribution of Borrower's assets, or give any preferential treatment, make any advance, directly or indirectly,

by way of loan, gift, bonus, or otherwise, to any owner or partner or any of its employees, or to any company directly or indirectly controlled or affiliated with or controlled by Borrower, or any other company." the Principals did exactly that.  The Debtor rapidly disbursed the monies loaned to the Debtor in the few months prior to the Petition Date.  The Debtor transferred monies either to the Debtor Affiliates so the Principals could retain control of those monies outside the reach of the Debtor's creditors and for their own benefit, or to creditors of the Debtor Affiliates.  In so doing, the Debtor's Principals were able to satisfy the obligations of the Debtor Affiliates, in which the Principals retained a direct financial interest, to sustain their operations while the Debtor was left with an unsustainable business and nothing left to satisfy its own creditors.

150.    In fact, it is clear that for a significant period of time prior to the Petition Date, including the period of time during which the Trustee seeks to recover the transfers set forth in this Complaint, the Debtor was insolvent.

151.    Almost every dollar that came in the door went immediately out.

152.    Even before the COVID-19 pandemic and other economic stressors faced by the Debtor, the Debtor incurred substantial amounts of debt that it could not possibly repay given the level of operations maintained by the Debtor.

153.    After the distributions of cash to "insiders", the Debtor's cash flow was woefully insufficient to sustain the Debtor's operations let alone to service the overwhelming amount of debt, which the Debtor borrowed at very high interest rates.

154.    Although these were the Debtor's circumstances during the entire period of the Principals' ownership and control over the Debtor (*i.e.,* from 2018 to the Petition Date), this became crystal clear when the Debtor incurred obligations to the MCA Companies with interest rates as high as 400%.  If it was not clear before, this lead to the Debtor's demise.

155.    It became clear that the Debtor was unable to meet its obligations to Key Food, NewBank and other creditors, which ultimately resulted in Key Food assuming operational control of the Debtor.

156.    The claims set forth in this Complaint seek to recover transfers that were disbursed from the Debtor, by and through the Principals, and by the complexity of this Complaint and others filed by the Trustee in connection with the Debtor's bankruptcy proceeding, shows the tangled scheme the Principals undertook to evade the Debtor's creditors.

### 5.    *The Bankruptcy Filing*

157.    On February 14, 2022, Key Food advised the Debtor that, as of February 19, 2022, it would "…no longer operate the Debtor's Store."  See First Singh Declaration at ¶ 5; [Sept. 28, 2022 Hearing Transcript at p. 72:13-15].

158.    On February 18, 2022, the Debtor filed the instant bankruptcy proceeding.

159.    As of the Petition Date, the Debtor's obligation to Key Food alone was $5,759,885.62.  *See* Key Foods Proof of Claim, No. 13 on the Claims Register for the Debtor's bankruptcy case.

160.    Singh stated the Debtor's purpose in filing the Bankruptcy Case was "[…] to preserve and maximize the Debtor's remaining assets and business value for the benefit of its stakeholders.  In the face of impending liquidity shortfall and significant industry headwinds caused, in part, by the adverse impacts of the COVID-19 pandemic, the Debtor decided to cease operation the Debtor's Store and intends to pursue certain claims, causes of action, and to liquidate its assets." *See* First Singh Declaration at ¶ 6.

161.    Between the Petition Date and the Conversion Date, the Debtor was required to file monthly operating reports with the Court in connection with its Chapter 11 bankruptcy filing.

162.     In August 2022, the Debtor's monthly operating report failed to disclose $136,000 in withdrawals made by the Debtor.

163.     The Debtor made withdrawals in excess of $100,000 in September 2022, which the Trustee identified in the Debtor's bank records.  The Debtor failed to disclose this to the Bankruptcy Court because it never filed its monthly operating reports for September 2022, as required.  Even after the Debtor filed its bankruptcy case, the Principals still sought to conceal its fraudulent activity from the Bankruptcy Court and its creditors.

164.     Even after the Conversion Date, the Debtor failed to turnover its accounting records to the Trustee and his retained professionals, forcing the Trustee to issue subpoenas to recover bank records for more than seventy (70) Debtor and Debtor Affiliate bank accounts to recreate the Debtor's accounting – the result of which is set forth in this and other complaints filed by the Trustee.

### FIRST CAUSE OF ACTION
**Avoidance and Recovery of Intentional Fraudulent Transfers**
**(11 U.S.C. §§ 548(a)(1)(A), 550 and 551)**
**(Against Defendant Narinder)**

165.     Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 164 of this Complaint as if fully set forth at length herein.

166.     The SBA Loan Transfer to Narinder was made within two (2) years of the Petition Date.

167.     The Debtor's transfer of the SBA Loan Transfer to Narinder was a transfer of money from the Debtor's funds held in the Debtor's bank account, which derived from the SBA Loan Proceeds.

168.     The SBA Loan Transfer to Narinder constituted a transfer of an interest of the Debtor within the meaning of Section 101(54) of the Bankruptcy Code.

169.    The SBA Loan Transfer to Narinder was to, or for the benefit of, Narinder as set forth above.

170.    Narinder, the recipient of the fraudulent transfer, is related to the Debtor's Principals (*i.e.* Singh's Father), and was, therefore, an "insider" of the Debtor.

171.    Upon information and belief, Narinder individually received a material direct or indirect benefit on account of the SBA Loan Transfer to Narinder.

172.    Upon information and belief, the Debtor intentionally obscured the SBA Loan Transfer to Narinder from creditors, third parties and others.

173.    In the Singh Declaration, Singh admitted that he transferred money from the Debtor to Narinder.

174.    In the Singh Declaration, Singh admitted that he further directed Narinder to transfer the monies he received from the Debtor to others, including Defendant Pritam, Defendant Kamlesh and Defendant Poola, out of concern that the MCA Companies would attempt to attach the confessions of judgment to those monies.

175.    Singh further admitted that he directed Narinder, along with Pritam, KCM Family and Mehta, at a minimum, to retain the money received or to make payments in satisfaction of loans these Defendants had purportedly made to the Debtor.

176.    Upon information and belief, Narinder did not loan money to the Debtor.

177.    The Debtor's books and records do not contain any reference to a loan from Narinder to the Debtor.

178.    In the alternative, upon information and belief, Narinder did not loan money to the Debtor in an amount commensurate with what he was paid by the Debtor from the SBA Loan Proceeds.

179.    The SBA Loan Transfer to Narinder was made without consideration, or with significantly inadequate consideration, to the Debtor.

180.    The SBA Loan Transfer to Narinder, and the subsequent transfers directed by Singh to be made from the SBA Loan Transfer to Narinder, were made in furtherance of the Debtor's scheme to defraud lenders and other creditors from monies they continued to lend and/or invest in the Debtor, or credit they continued to extend to the Debtor.

181.    The SBA Loan Transfer to Narinder was made with actual intent by the Debtor to hinder, delay and/or defraud the Debtor's existing creditors and individuals and entities to which the Debtor was or would become obligated.

182.    At the time of the SBA Loan Transfer to Narinder, the Debtor was aware it had creditors holding one or more unsecured claims against the Debtor allowable under Section 502 of the Bankruptcy Code.

183.    Specifically, at the time of the SBA Loan Transfer to Narinder, the Debtor was aware of an outstanding claim underlying the Lugo Lawsuit, among other debts and obligations that remained unpaid as of the Petition Date and to the present day.

184.    The SBA Loan Transfer to Narinder was made while the Debtor was insolvent or had unreasonably small capital.

185.    Narinder continued to control, use, and/or enjoy the property transferred by the Debtor in the SBA Loan Transfer to Narinder subsequent to the transfer being made.

186.    The SBA Loan Transfer to Narinder was paid by the Debtor, at Singh's direction, with the actual intent to hinder, delay, and/or defraud the Debtor's creditors and individuals and entities to which the Debtor would become obligated.

187.    Based upon the foregoing, Plaintiff is entitled to an order and judgment against Narinder avoiding the SBA Loan Transfer to Narinder in the amount of $1,500,000 and directing that the subject of the SBA Loan Transfer to Narinder or its value be returned to the Trustee, and that Narinder be held liable for the return of the SBA Loan Transfer to Narinder as a direct or indirect beneficiary.

**SECOND CAUSE OF ACTION**
**Avoidance and Recovery of Constructive Fraudulent Transfer**
**(11 U.S.C. §§ 548(a)(1)(A), 550 and 551)**
**(Against Defendant Narinder)**

188.    Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 187 of this Complaint as if fully set forth at length herein.

189.    The SBA Loan Transfer to Narinder constituted a transfer of money, property, and value of the Debtor to Narinder.

190.    Narinder, the recipient of the Debtor's SBA Loan Transfer to Narinder, was related to, and is, an "insider" of the Debtor as that term is defined by 11 U.S.C. § 101(31).

191.    Upon information and belief, Narinder individually received a material direct or indirect benefit on account of the SBA Loan Transfer to Narinder.

192.    Upon information and belief, the Debtor's books and records do not disclose the SBA Loan Transfer to Narinder.

193.    The SBA Loan Transfer to Narinder was made to Narinder without fair consideration and/or reasonably equivalent value to the Debtor.

194.    At the time the Debtor made the SBA Loan Transfer to Narinder, the Debtor had incurred or was about to incur a liability which remains unpaid to this day including, but not limited to the claim underlying the Lugo Lawsuit.

195.    At the time it made the SBA Loan Transfer to Narinder, the Debtor: (i) was insolvent or became insolvent as a result of the SBA Loan Transfer to Narinder; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital; and/or (iii) intended to incur, or believed that the Debtor would incur debts that would be beyond the Debtor's ability to pay as such debts matured.

196.    Based upon the foregoing, the Trustee is entitled to an order and judgment against Narinder avoiding the SBA Loan Transfer to Narinder and directing that the subject of the fraudulent transfer, the SBA Loan Transfer to Narinder, or its value, be returned to the Trustee, and that Narinder be held liable for the return of the SBA Loan Transfer to Narinder as a direct or indirect beneficiary thereof.

**THIRD CAUSE OF ACTION**
**Avoidance of Preferential Transfer from an "Insider"**
**(11 U.S.C. §§ 547(b), 550)**
**(Against Defendant Narinder)**

197.    Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 196 of this Complaint as if fully set forth at length herein.

198.    Within the few months prior to the Petition Date, the SBA loaned the Debtor more than $2 million that was intended for the Debtor to use solely as working capital to alleviate economic injury caused by the disaster occurring in the month of January 31, 2020 and continuing thereafter.

199.    However, on December 29, 2021, the same day the Debtor received the Second SBA Deposit, the Debtor effectuated the Transfer of SBA Loan to Narinder in the amount of $1,500,000, which constituted the entire amount of the Second SBA Deposit of the SBA Loan Proceeds intended for and received by the Debtor.

200.     The Debtor transferred money, property, and other value to Narinder through the SBA Loan Transfer to Narinder in the amount of $1,500,000 on December 29, 2021.

201.     To the extent the SBA Loan Transfer to Narinder does not constitute a fraudulent transfer, it was made on account of an antecedent debt owed by the Debtor to Narinder.

202.     The SBA Loan Transfer to Narinder was made to or for the benefit of Narinder.

203.     Upon information and belief, Narinder is the father of Singh, the Vice President of the Debtor.

204.     Narinder is an "insider" of the Debtor as that term is defined in Section 101(31) the Bankruptcy Code.

205.     The SBA Loan Transfer to Narinder was made to or for the benefit of an insider of the Debtor.

206.     The SBA Loan Transfer to Narinder was made while the Debtor was insolvent or presumed to be insolvent.

207.     Narinder, as the father of the Debtor's Vice President and the Father-in-Law of the Debtor's President, has reasonable cause to believe that the Debtor was insolvent at the time of the SBA Loan Transfer to Narinder.

208.     The SBA Loan Transfer to Narinder was made within one (1) year of the Petition Date.

209.     As a result of the SBA Loan Transfer to Narinder, Narinder received more than he would receive if: (i) the Debtor's cases were a case under chapter 7 of the Bankruptcy Code; (ii) the SBA Loan Transfer to Narinder had not been made; and (iii) Narinder received payment on account of his claims, if any, against the Debtor to the extent provided under the Bankruptcy Code.

210.    Based on the foregoing, the Trustee is entitled to an order and judgment against Narinder as the transferee of the SBA Loan Transfer to Narinder avoiding the SBA Loan Transfer to Narinder and directing that the subject of the SBA Loan Transfer to Narinder or its value be returned to the Trustee, and that Narinder be held liable for the return of the SBA Loan Transfer to Narinder as a direct and indirect beneficiary.

**FOURTH CAUSE OF ACTION**
**Recovery of Subsequent Transfers**
**(11 U.S.C. §§ 550 and 551)**
**(Against Defendant Pritam)**

211.    Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 210 of this Complaint as if fully set forth at length herein.

212.    On the date of the transfer, the SBA Loan Transfer to Narinder was the property of the Debtor.

213.    As set forth herein, the SBA Loan Transfer to Narinder is avoidable and recoverable under sections 547 and/or 548, 550 and 551 of the Bankruptcy Code.

214.    Following the SBA Loan Transfer to Narinder, on January 7, 2022, Narinder withdrew $1,200,000 of the $1,500,000 of SBA Loan Proceeds he received from the Debtor from the Gahra Bank Account.

215.    Narinder's withdrawal from the Gahra Bank Account was in the form of two (2) cashier's checks each in the amount of $600,000, made payable to Pritam.

216.    Pritam is the mother of the Debtor's Vice President and the Mother-in-Law of the Debtor's President.

217.    Pritam is an "insider" of the Debtor as that term is defined in Section 101(31) of the Bankruptcy Code.

218.     Upon information and belief, between January 7, 2022 and January 20, 2022, Narinder, the initial transferee of the Debtor's SBA Loan Proceeds, subsequently transferred a portion of the SBA Loan Transfer to Narinder in the form of one (1) of the cashier's checks Narinder withdrew on January 7, 2023, and delivered it to, or for the benefit of his wife, Pritam, in the amount of $600,000 (*i.e.* the Narinder Subsequent Transfer to Pritam).

219.     The Narinder Subsequent Transfer to Pritam was made with Debtor funds and property that belonged to the Debtor.

220.     The Narinder Subsequent Transfer to Pritam was made directly or indirectly to, or for the benefit of, Pritam.

221.     On January 20, 2022, Pritam deposited the Narinder Subsequent Transfer to Pritam into the Pritam Chase Account.

222.     Pritam received the Narinder Subsequent Transfer to Pritam, totaling $600,000, which is recoverable pursuant to section 550(a) of the Bankruptcy Code.

223.     Pritam is the immediate or mediate transferee of the SBA Loan Transfer to Narinder.

224.     In addition, the Security Title Transfer made by Narinder to Security Title on March 8, 2022 in the amount of $600,000 from the Gahra Bank Account originated with Debtor funds, including the proceeds of the SBA Loan.

225.     The Security Title Transfer was used to purchase the Indiana Property, which is owned or held in the name of Pritam.

226.     The Security Title Transfer was made directly, or indirectly, for the benefit of Pritam.

227.    As of the date of this Complaint, Pritam still owns the Indiana Property which was purchased using Debtor monies.

228.    Pritam received the value of the Security Title Transfer, which is recoverable pursuant to section 550(a) of the Bankruptcy Code.

229.    Pritam is the immediate or mediate transferee of the Security Title Transfer.

230.    Based upon the foregoing, Plaintiff is entitled to an order and judgment against Pritam, pursuant to section 550(a) and 551 of the Bankruptcy Code, recovering the Narinder Subsequent Transfer to Pritam and the Security Title Transfer, or the value thereof, for the benefit of the Debtor's estate.

**FIFTH CAUSE OF ACTION**
**Avoidance and Recovery of Intentional Fraudulent Transfers**
**(11 U.S.C. §§ 544, 548(a)(1)(A), 550 and 551; NY DCL §§ 276-279)**
**(Against Defendants KCM Family and Mehta)**

231.    Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 230 of this Complaint as if fully set forth at length herein.

232.    Between November 26, 2018 and December 4, 2019, the Debtor made a series of seventeen (17) direct transfers from the Debtor to KCM Family, totaling $604,100 (*i.e.,* the KCM Family Fraudulent Transfers, as set forth below:

| Date | Transferor | Transferee | Amount |
|---|---|---|---|
| November 26, 2018 | Debtor | Kamlesh C Mehta Family LLC | $40,000 |
| November 27, 2018 | Debtor | Kamlesh C Mehta Family LLC | $10,000 |
| February 15, 2019 | Debtor | Kamlesh C Mehta Family LLC | $110,000 |
| June 12, 2019 | Debtor | Kamlesh C Mehta Family LLC | $50,000 |
| June 25, 2019 | Debtor | Kamlesh C Mehta Family LLC | $25,000 |

| August 20, 2019 | Debtor | Kamlesh C Mehta Family LLC | $15,000 |
| August 22, 2019 | Debtor | Kamlesh C Mehta Family LLC | $5,000 |
| September 4, 2019 | Debtor | Kamlesh C Mehta Family LLC | $20,000 |
| September 5, 2019 | Debtor | Kamlesh C Mehta Family LLC | $25,000 |
| September 13, 2019 | Debtor | Kamlesh C Mehta Family LLC | $10,000 |
| September 20, 2019 | Debtor | Kamlesh C Mehta Family LLC | $75,000 |
| September 25, 2019 | Debtor | Kamlesh C Mehta Family LLC | $6,000 |
| October 8, 2019 | Debtor | Kamlesh C Mehta Family LLC | $125,000 |
| October 22, 2019 | Debtor | Kamlesh C Mehta Family LLC | $5,500 |
| October 28, 2019 | Debtor | Kamlesh C Mehta Family LLC | $20,000 |
| November 6, 2019 | Debtor | Kamlesh C Mehta Family LLC | $60,000 |
| December 4, 2019 | Debtor | Kamlesh C Mehta Family LLC | $2,600 |
| | | **TOTAL** | **$604,100** |

233.    Each of the KCM Family Fraudulent Transfers was made within four (4) years of the Petition Date.

234.    The Debtor's transfer of each of the KCM Family Fraudulent Transfers was a transfer of money from the Debtor's funds held in the Debtor's bank account.

235.    Each of the KCM Family Fraudulent Transfers constituted a transfer of an interest of the Debtor within the meaning of Section 101(54) of the Bankruptcy Code.

236.    Each of the KCM Family Fraudulent Transfers was to, or for the benefit of KCM Family or Mehta.

237.    Upon information and belief, KCM Family and/or Mehta received a material direct or indirect benefit on account of each of the KCM Family Fraudulent Transfers.

238.     The Debtor intentionally obscured each of the KCM Family Fraudulent Transfers from creditors, third parties and others.

239.     Upon information and belief, KCM Family never loaned money to the Debtor.

240.     Upon information and belief, Mehta never loaned money to the Debtor.

241.     The Debtor's books and records do not contain any reference to a loan from KCM Family or Mehta to the Debtor.

242.     In the alternative, upon information and belief, neither KCM Family nor Mehta loaned money to the Debtor in amounts commensurate with what it was paid by the Debtor by the KCM Family Fraudulent Transfers.

243.     Each of the KCM Family Fraudulent Transfers was made without consideration, or with significantly inadequate consideration, to the Debtor.

244.     Each of the KCM Family Fraudulent Transfers was made in furtherance of the Debtor's scheme to defraud lenders and other creditors from monies they continued to lend and/or invest in the Debtor, or credit they continued to extend to the Debtor.

245.     Each of the KCM Family Fraudulent Transfers was made with actual intent by the Debtor to hinder, delay and/or defraud the Debtor's existing creditors and individuals and entities to which the Debtor was or would become obligated.

246.     At the time of each of the KCM Family Fraudulent Transfers, the Debtor was aware it had creditors holding one (1) or more unsecured claims against the Debtor allowable under Section 502 of the Bankruptcy Code.

247.     Specifically, at the time of each of the KCM Family Fraudulent Transfers, the Debtor was aware of an outstanding claim or claims underlying the Lugo Lawsuit, among other

debts and obligations that remained unpaid as of the Petition Date and as of the date of this Complaint.

248.     Each of the KCM Family Fraudulent Transfers was made while the Debtor was insolvent or had unreasonably small capital.

249.     KCM Family and/or Mehta continued to control, use, and/or enjoy the property transferred by the Debtor in each of the KCM Family Fraudulent Transfers subsequent to each transfer being made.

250.     Each of the KCM Family Fraudulent Transfers was paid by the Debtor, at Singh's direction, with the actual intent to hinder, delay, and/or defraud the Debtor's creditors and individuals and entities to which the Debtor would become obligated.

251.     Based upon the foregoing, Plaintiff is entitled to an order and judgment against KCM Family and/or Mehta avoiding each of the KCM Family Fraudulent Transfers in the amount totaling $604,100, and directing that the subject of each of the KCM Family Fraudulent Transfers or their value be returned to the Trustee, and that KCM Family and/or Mehta be held liable for the return of the KCM Family Fraudulent Transfers as a direct or indirect beneficiary.

### SIXTH CAUSE OF ACTION
**Avoidance and Recovery of Constructive Fraudulent Transfer**
**(11 U.S.C. §§ 544, 548(a)(1)(A), 550 and 551; NYDCL §§ 272 – 275)**
**(Against Defendant KCM Family and/or Mehta)**

252.     Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 251 of this Complaint as if fully set forth at length herein.

253.     Each of the KCM Family Fraudulent Transfers constituted a transfer of money, property, and value of the Debtor to KCM Family and/or Mehta.

254.     Upon information and belief, KCM Family and/or Mehta received a material direct or indirect benefit on account of the KCM Family Fraudulent Transfers.

255.    The Debtor's books and records make no reference to an obligation of the Debtor to make payments to KCM Family and/or Mehta.

256.    The KCM Family Fraudulent Transfers were made to or for the benefit of KCM Family and/or Mehta without fair consideration and/or reasonably equivalent value to the Debtor.

257.    At the time the Debtor made the KCM Family Fraudulent Transfers to or for the benefit of KCM Family and/or Mehta, the Debtor had incurred or was about to incur a liability which remains unpaid to this day including, but not limited to the claim(s) underlying the Lugo Lawsuit, among other claims and obligations that remained unpaid as of the Petition Date, and as of the date hereof.

258.    At the time it made the KCM Family Fraudulent Transfers, the Debtor: (i) was insolvent or became insolvent as a result of the KCM Family Fraudulent Transfers; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital; and/or (iii) intended to incur, or believed that the Debtor would incur debts that would be beyond the Debtor's ability to pay as such debts matured.

259.    Based upon the foregoing, the Trustee is entitled to an order and judgment against KCM Family and/or Mehta avoiding the KCM Family Fraudulent Transfers and directing that the subject of the fraudulent transfer, the KCM Family Fraudulent Transfers, or their value, be returned to the Trustee, and that KCM Family and/or Mehta be held liable for the return of the KCM Family Fraudulent Transfers as a direct or indirect beneficiary thereof.

## SEVENTH CAUSE OF ACTION
### Recovery of Subsequent Transfers
### (11 U.S.C. §§ 550 and 551)
### (Against Defendant KCM Family and/or Mehta)

260.     Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 259 of this Complaint as if fully set forth at length herein.

261.     On the date of the transfer, the SBA Loan Transfer to Narinder was the property of the Debtor.

262.     As set forth herein, the SBA Loan Transfer to Narinder is avoidable and recoverable under sections 547 and/or 548, 550 and 551 of the Bankruptcy Code.

263.     Following the SBA Loan Transfer to Narinder, on January 7, 2022, Narinder withdrew $200,000 of the $1,500,0000 of SBA Loan Proceeds he received from the Debtor from the Gahra Bank Account.

264.     Narinder's withdrawal from the Gahra Bank Account was in the form of two (2) cashier's checks each in the amount of $100,000, made payable to KCM Family and/or Mehta.

265.     Upon information and belief, between January 7, 2022 and January 20, 2022, Narinder, the initial transferee of the Debtor's SBA Loan Proceeds, subsequently transferred a portion of the SBA Loan Transfer to Narinder in the form of one (1) of the cashier's checks Narinder withdrew on January 7, 2023 to, or for the benefit of, KCM Family in the amount of $100,000 (*i.e.* the Narinder Subsequent Transfer to KCM Family).

266.     The Narinder Subsequent Transfer to KCM Family was made with Debtor monies and property that belonged to the Debtor.

267.     The Narinder Subsequent Transfer to KCM Family was made directly or indirectly to, or for the benefit of, KCM Family and/or Mehta.

268.    Upon information and belief, on or around January 20, 2022, KCM Family deposited the Narinder Subsequent Transfer to KCM Family into its bank account or a bank account owned or controlled by Mehta.

269.    KCM Family and/or Mehta received the KCM Family Subsequent Transfer, totaling $100,000, which is recoverable pursuant to section 550(a) of the Bankruptcy Code.

270.    KCM Family and/or Mehta is the immediate or mediate transferee of the Narinder Subsequent Transfer to KCM Family.

271.    On the date of the transfer, the Debtor Affiliate Transfers were the property of the Debtor.

272.    As set forth herein and in the Trustee's complaint against the Debtor Affiliates, each of the Debtor Affiliate Transfers is avoidable and recoverable under sections 547 and/or 548, 550 and 551 of the Bankruptcy Code or corresponding provisions under the New York Debtor and Creditor law as against the Debtor Affiliate Transferees.

273.    Following the Debtor Affiliate Transfers, KCM Family and/or Mehta received the KCM Family Debtor Affiliate Transfers.

274.    The KCM Family Debtor Affiliate Transfers were made with monies and property that belonged to the Debtor.

275.    The KCM Family Debtor Affiliate Transfers were made directly or indirectly to, or for the benefit of, KCM Family and/or Mehta.

276.    Upon information and belief, KCM Family and/or Mehta deposited the KCM Family Debtor Affiliate Transfers into its bank account or a bank account owned or controlled by Mehta.

277.    KCM Family and/or Mehta received the KCM Family Debtor Affiliate Transfers, totaling $296,500, which is recoverable pursuant to section 550(a) of the Bankruptcy Code.

278.    KCM Family and/or Mehta is the immediate or mediate transferee of the KCM Family Debtor Affiliate Transfers.

279.    Based upon the foregoing, Plaintiff is entitled to an order and judgment against KCM Family and/or Mehta, pursuant to section 550(a) and 551 of the Bankruptcy Code, recovering the Narinder Subsequent Transfer to KCM Family and the KCM Family Debtor Affiliate Transfers, or the value thereof, for the benefit of the Debtor's estate.

**EIGHTH CAUSE OF ACTION**
**Recovery of Subsequent Transfers**
**(11 U.S.C. §§ 550 and 551)**
**(Against Defendant Poola)**

280.    Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 279 of this Complaint as if fully set forth at length herein.

281.    On the date of the transfer, the SBA Loan Transfer to Narinder was the property of the Debtor.

282.    As set forth herein, the SBA Loan Transfer to Narinder is avoidable and recoverable under sections 547 and/or 548, 550 and 551 of the Bankruptcy Code.

283.    Following the SBA Loan Transfer to Narinder, on January 7, 2022, Narinder subsequently transferred the Narinder Subsequent Transfer to Pritam.

284.    As set forth herein, the Narinder Subsequent Transfer to Pritam is avoidable and recoverable under Sections 550 and 551 of the Bankruptcy Code.

285.    On January 26, 2022, Pritam withdrew $350,000 from the Pritam Chase Account.

286.     Of the amount withdrawn, Pritam caused $200,000 to be withdrawn in the form of a cashier's check in the amount of $200,000 made payable to Jagadeesan Poola (*i.e.*, the Pritam Transfer to Poola).

287.     The Pritam Transfer to Poola was made with Debtor funds and property that belonged to the Debtor.

288.     Upon information and belief, Pritam delivered the Pritam Transfer to Poola.

289.     Upon information and belief, Poola deposited the Pritam Transfer to Poola into his own bank account for his own benefit.

290.     The Pritam Transfer to Poola was made directly or indirectly to, or for the benefit of Poola.

291.     Poola received the Pritam Transfer to Poola, totaling $200,000, which is recoverable pursuant to section 550(a) of the Bankruptcy Code.

292.     Poola is the immediate or mediate transferee of the SBA Loan Transfer to Narinder and the Narinder Subsequent Transfer to Pritam.

293.     On the date of the transfer, the Debtor Affiliate Transfers were the property of the Debtor.

294.     As set forth herein and in the Trustee's complaint against the Debtor Affiliates, each of the Debtor Affiliate Transfers is avoidable and recoverable under sections 547 and/or 548, 550 and 551 of the Bankruptcy Code or corresponding provisions under the New York Debtor and Creditor law as against the Debtor Affiliate Transferees.

295.     Following the Debtor Affiliate Transfers, Poola received the Poola Debtor Affiliate Transfers.

296. The Poola Debtor Affiliate Transfers were made with monies and property that belonged to the Debtor.

297. The Poola Debtor Affiliate Transfers were made directly or indirectly to, or for the benefit of, Poola.

298. Upon information and belief, Poola deposited the Poola Debtor Affiliate Transfers into his bank account.

299. Poola received the Poola Debtor Affiliate Transfers, totaling $247,500, which are recoverable pursuant to section 550(a) of the Bankruptcy Code.

300. Poola is the immediate or mediate transferee of the Debtor Affiliate Transfers and the Poola Debtor Affiliate Transfers.

301. Based upon the foregoing, Plaintiff is entitled to an order and judgment against Poola, pursuant to section 550(a) and 551 of the Bankruptcy Code, recovering the Pritam Transfer to Poola and the Poola Debtor Affiliate Transfers, or the value thereof, for the benefit of the Debtor's estate.

## NINTH CAUSE OF ACTION
### Recovery of Subsequent Transfers
### (11 U.S.C. §§ 550 and 551)
### (Against Defendant Catalyst Business)

302. Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 301 of this Complaint as if fully set forth at length herein.

303. On the date of the transfer, the SBA Loan Transfer to Narinder was the property of the Debtor.

304. As set forth herein, the SBA Loan Transfer to Narinder is avoidable and recoverable under sections 547 and/or 548, 550 and 551 of the Bankruptcy Code.

305.    Following the SBA Loan Transfer to Narinder, on January 7, 2022, Narinder subsequently transferred the Narinder Subsequent Transfer to Pritam.

306.    As set forth herein, the Narinder Subsequent Transfer to Pritam is avoidable and recoverable under Sections 550 and 551 of the Bankruptcy Code.

307.    On February 9, 2022, Pritam transferred $50,000 from the Pritam Chase Account to Catalyst Business (*i.e.,* the Catalyst Transfer).

308.    By virtue of the SBA Loan to Narinder and the Narinder Subsequent Transfer to Pritam preceding it, the Catalyst Transfer was made with monies and property that belonged to the Debtor.

309.    Upon information and belief, Pritam transferred the Catalyst Transfer to Catalyst Business.

310.    Upon information and belief, Catalyst Business deposited the Catalyst Transfer into its own account for its benefit.

311.    The Catalyst Transfer was made directly or indirectly to, or for the benefit of Catalyst Business.

312.    Catalyst Business received the Catalyst Transfer, totaling $50,000, which is recoverable pursuant to section 550(a) of the Bankruptcy Code.

313.    Catalyst Business is the immediate or mediate transferee of the SBA Loan Transfer to Narinder and the Narinder Subsequent Transfer to Pritam.

314.    Based upon the foregoing, Plaintiff is entitled to an order and judgment against Catalyst Business, pursuant to section 550(a) and 551 of the Bankruptcy Code, recovering the Catalyst Transfer, or the value thereof, for the benefit of the Debtor's estate.

**TENTH CAUSE OF ACTION**
**Recovery of Subsequent Transfers**
**(11 U.S.C. §§ 550 and 551)**
**(Against Defendant Park Hillside)**

315.    Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 314 of this Complaint as if fully set forth at length herein.

316.    On the date of the transfer, the SBA Loan Transfer to Narinder was the property of the Debtor.

317.    As set forth herein, the SBA Loan Transfer to Narinder is avoidable and recoverable under sections 547 and/or 548, 550 and 551 of the Bankruptcy Code.

318.    Following the SBA Loan Transfer to Narinder, Narinder made a series of subsequent transfers to Park Hillside Realty (*i.e.,* the Park Hillside Subsequent Transfers) from the Gahra Bank Account.

319.    Specifically, Narinder made the following subsequent transfers to Park Hillside Realty on the following dates:

| Transfer Date | Subsequent Transferor | Subsequent Transferee | Amount |
|---|---|---|---|
| February 23, 2022 | Narinder | Park Hillside Realty | $100,000.00 |
| February 23, 2022 | Narinder | Park Hillside Realty | $4,650.00 |
| February 23, 2022 | Narinder | Park Hillside Realty | $90,943.00 |
| March 14, 2022 | Narinder | Park Hillside Realty | $26,550.00 |
| March 14, 2022 | Narinder | Park Hillside Realty | $4,152.18 |
| | | **TOTAL** | **$226,295.18** |

320.    Each of the Park Hillside Subsequent Transfers was made with Debtor funds and property that belonged to the Debtor.

321.     Upon information and belief, Park Hillside deposited each of the Park Hillside Subsequent Transfers into its own account for its benefit.

322.     Each of the Park Hillside Subsequent Transfers was made directly or indirectly to, or for the benefit of Park Hillside.

323.     Park Hillside received each of the Park Hillside Subsequent Transfers, totaling $226,295.18, which is recoverable pursuant to section 550(a) of the Bankruptcy Code.

324.     Park Hillside is the immediate or mediate transferee of the SBA Loan Transfer to Narinder.

325.     On the date of the transfer, the Debtor Affiliate Transfers were the property of the Debtor.

326.     As set forth herein and in the Trustee's complaint against the Debtor Affiliates, each of the Debtor Affiliate Transfers is avoidable and recoverable under sections 547 and/or 548, 550 and 551 of the Bankruptcy Code or corresponding provisions under the New York Debtor and Creditor law as against the Debtor Affiliate Transferees.

327.     Following the Debtor Affiliate Transfers, Park Hillside received the Park Hillside Debtor Affiliate Transfers.

328.     The Park Hillside Debtor Affiliate Transfers were made with monies and property that belonged to the Debtor.

329.     The Park Hillside Debtor Affiliate Transfers were made directly or indirectly to, or for the benefit of Poola.

330.     Upon information and belief, Park Hillside deposited the Park Hillside Debtor Affiliate Transfers into its bank account.

331.    Park Hillside received the Park Hillside Debtor Affiliate Transfers, totaling $145,040, which are recoverable pursuant to section 550(a) of the Bankruptcy Code.

332.    Park Hillside is the immediate or mediate transferee of the Debtor Affiliate Transfers and the Park Hillside Debtor Affiliate Transfers.

333.    Based upon the foregoing, Plaintiff is entitled to an order and judgment against Park Hillside, pursuant to section 550(a) and 551 of the Bankruptcy Code, recovering each of the Park Hillside Subsequent Transfers and the Park Hillside Debtor Affiliate Transfers, or the value thereof, for the benefit of the Debtor's estate.

### ELEVENTH CAUSE OF ACTION
**Recovery of Subsequent Transfers**
**(11 U.S.C. §§ 550 and 551)**
**(Against Defendant PK Business)**

334.    Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 333 of this Complaint as if fully set forth at length herein.

335.    On the date of the transfer, the SBA Loan Transfer to Narinder was the property of the Debtor.

336.    As set forth herein, the SBA Loan Transfer to Narinder is avoidable and recoverable under sections 547 and/or 548, 550 and 551 of the Bankruptcy Code.

337.    Following the SBA Loan Transfer to Narinder, on January 7, 2022, Narinder subsequently transferred the Narinder Subsequent Transfer to Pritam.

338.    As set forth herein, the Narinder Subsequent Transfer to Pritam is avoidable and recoverable under Sections 550 and 551 of the Bankruptcy Code.

339.    Following the SBA Loan Transfer to Narinder and the Narinder Subsequent Transfer to Pritam, between February 17, 2022 and March 18, 2022, Narinder made one (1) transfer

of $41,417 and Pritam made three (3) transfers totaling $46,000 to PK Business (*i.e.*, the Subsequent Transfers to PK Business).

340.     By virtue of the SBA Loan to Narinder and the Narinder Subsequent Transfer to Pritam preceding them, the Subsequent Transfers to PK Business were made with monies and property that belonged to the Debtor.

341.     Upon information and belief, Narinder and Pritam transferred the Subsequent Transfers to PK Business to PK Business.

342.     Upon information and belief, PK Business deposited the Subsequent Transfers to PK Business into its own account for its benefit.

343.     The Subsequent Transfers to PK Business were made directly or indirectly to, or for the benefit of PK Business.

344.     PK Business received the Subsequent Transfers to PK Business, totaling $87,417, which is recoverable pursuant to section 550(a) of the Bankruptcy Code.

345.     PK Business is the immediate or mediate transferee of the SBA Loan Transfer to Narinder and the Narinder Subsequent Transfer to Pritam.

346.     In or around the same time, on February 23, 2022 and March 7, 2022, PK Business paid $10,000 and $132,958.46, respectively, towards the purchase of the Indiana Property, which was purchased by or for the benefit of Pritam.

347.     Based upon the foregoing, Plaintiff is entitled to an order and judgment against PK Business, pursuant to section 550(a) and 551 of the Bankruptcy Code, recovering the Subsequent Transfers to PK Business, or the value thereof, for the benefit of the Debtor's estate.

**TWELFTH CAUSE OF ACTION**
**Recovery of Subsequent Transfers**
**(11 U.S.C. §§ 550 and 551)**
**(Against Defendant Security Title)**

348.     Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 347 of this Complaint as if fully set forth at length herein.

349.     On the date of the transfer, the SBA Loan Transfer to Narinder was the property of the Debtor.

350.     As set forth herein, the SBA Loan Transfer to Narinder is avoidable and recoverable under sections 547 and/or 548, 550 and 551 of the Bankruptcy Code.

351.     Following the SBA Loan Transfer to Narinder, on January 7, 2022, Narinder withdrew $1,200,000 of the $1,500,000 of SBA Loan Proceeds he received from the Debtor from the Gahra Bank Account.

352.     Narinder's withdrawal from the Gahra Bank Account was in the form of two (2) cashier's checks each in the amount of $600,000, made payable to Pritam.

353.     Upon information and belief, between January 7, 2022 and January 20, 2022, Narinder delivered one (1) of the two (2) $600,000 cashier's checks made payable to Pritam to Pritam (*i.e.* the Narinder Subsequent Transfer to Pritam).

354.     On March 7, 2022, Narinder re-deposited the second of the $600,000 cashier's checks made payable to Pritam back into the Gahra Bank Account.

355.     The next day, on March 8, 2022, Narinder wired $600,000, the same amount he re-deposited into the Gahra Bank Account to Security Title (*i.e.,* the Security Title Transfer).

356.     Upon information and belief, the Security Title Transfer funded a significant portion of the $750,000 purchase price of the Indiana Property.

357.     As set forth herein and upon information and belief, the balance of the purchase price of the Indiana Property was funded by PK Business, which, upon information and belief, is owned by Pritam and/or Narinder.

358.     In the contract of sale for the Indiana Property, Pritam represented that she intended the property to be her primary residence.

359.     The Security Title Transfer was made with monies and property that belonged to the Debtor.

360.     Upon information and belief, Security Title either deposited the Security Title Transfer into its own account for its benefit or partial benefit or held the funds in escrow for the seller of the Indiana Property.

361.     Upon information and belief, the Security Title Transfer was made directly or indirectly to, or for the benefit or partial benefit of Security Title.

362.     Security Title received the Security Title Transfer, totaling $600,000.00, which is recoverable pursuant to section 550(a) of the Bankruptcy Code.

363.     Security Title is the immediate or mediate transferee of the SBA Loan Transfer to Narinder.

364.     Based upon the foregoing, Plaintiff is entitled to an order and judgment against Security Title, pursuant to section 550(a) and 551 of the Bankruptcy Code, recovering each of the Security Title Subsequent Transfers, or the value thereof, for the benefit of the Debtor's Estate.

### THIRTEENTH CAUSE OF ACTION
**Recovery of Subsequent Transfers**
**(11 U.S.C. §§ 550 and 551)**
**(Against Defendant Silver Star)**

365.     Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 364 of this Complaint as if fully set forth at length herein.

366.    On the date of the transfer, the SBA Loan Transfer to Narinder was the property of the Debtor.

367.    As set forth herein, the SBA Loan Transfer to Narinder is avoidable and recoverable under sections 547 and/or 548, 550 and 551 of the Bankruptcy Code.

368.    Following the SBA Loan Transfer to Narinder, on January 27, 2022, Narinder subsequently transferred $50,000 to Silver Star (*i.e.,* the Narinder Silver Star Transfer) from the Gahra Bank Account.

369.    The Narinder First Silver Star Transfer was made with monies or property that belonged to the Debtor.

370.    Following the SBA Loan Transfer to Narinder, on January 7, 2022, Narinder subsequently transferred the Narinder Subsequent Transfer to Pritam.

371.    As set forth herein, the Narinder Subsequent Transfer to Pritam is avoidable and recoverable under Sections 550 and 551 of the Bankruptcy Code.

372.    On January 24, 2022, Pritam transferred $50,000 from the Pritam Chase Account to Silver Star (*i.e.,* the Pritam Silver Star Transfer).

373.    The Pritam Silver Star Transfer was made with Debtor funds and property that belonged to the Debtor.

374.    Upon information and belief, Silver Star deposited each of the Silver Star Transfers into its own account for its benefit.

375.    Each of the Silver Star Transfers was made directly or indirectly to, or for the benefit of Silver Star.

376.    Silver Star received each of the Silver Star Transfers, totaling $100,000, which is recoverable pursuant to section 550(a) of the Bankruptcy Code.

377.     Silver Star is the immediate or mediate transferee of the SBA Loan Transfer to Narinder and/or the Narinder Subsequent Transfer to Pritam.

378.     Based upon the foregoing, Plaintiff is entitled to an order and judgment against Silver Star, pursuant to section 550(a) and 551 of the Bankruptcy Code, recovering each of the Silver Star Transfers, or the value thereof, for the benefit of the Debtor's estate.

### FOURTEENTH CAUSE OF ACTION
**Recovery of Avoidable Transfers or Value Thereof from All Initial,**
**Immediate or Mediate Transferees**
**11 U.S.C. §§ 502(d) and (j))**
**(Against All Defendants)**

379.     Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 378 of this Complaint as if fully set forth at length herein.

380.     Upon avoidance of each of the fraudulent transfers, subsequent transfers and preferences, the Trustee is entitled to recover for the benefit of the Debtor's estate the property transferred, or the value thereof, from the initial transferee, the individual or entity for whose benefit such transfer was made, or any immediate or mediate transferee of such initial transferee.

381.     Based upon the foregoing, the Trustee is entitled to a judgment against each recipient or beneficiary of any of the fraudulent transfers, preferential transfers or subsequent transfers of the Debtor's property, and any subsequently identified immediate or mediate transferee of such initial transferee of the fraudulent, preferential or subsequent transfers of the Debtor's property, for the full value of the applicable transfer.

### FIFTEENTH CAUSE OF ACTION
**Unjust Enrichment**
**Common Law (New York Unless Otherwise Provided for)**
**(Against All Defendants)**

382.     Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 381 of this Complaint as if fully set forth at length herein.

383.     Each of the Transfers constituted a transfer of an interest of the Debtor in property within the meaning of Section 101(54) of the Bankruptcy Code.

384.     Each of the Transfers was to or for the benefit of each of the Defendants named herein.

385.     Each of the Defendants was enriched as a result of the Transfers.

386.     The enrichment of each of the Defendants was at the expense of the Debtor, its estate and its creditors.

387.     Each of the Defendants wrongfully secured a benefit from the Debtor by refusing to repay the Debtor the amounts of the Transfers they received, which the Debtor was not obligated to pay them.

388.     At the time of the Transfers to each of the Defendants, the Debtor could not pay its debts as they became due.

389.     It would be against equity and good conscience to permit any of the Defendants, or recipients of the Transfers to retain the benefits of the monies paid to them by the Debtor without having provided any goods, products, materials, money and/or services to the Debtor in exchange therefor.

390.     The Defendants' failure to replenish the Debtor's estate the amounts of the Transfers, is contrary to the principles of fairness and good conscience.

391.     Each of the Defendants would be unjustly enriched unless the Trustee is permitted to recover the monies comprising the Transfers for the benefit of the Debtor's estate and its creditors.

392.     Based upon the foregoing, the Trustee is entitled to an order and judgment against each Defendant, on account of the monies comprising the Transfers, in the amount for which each of the Defendants was enriched, which is collectively an amount no less than $2 million, and

directing the Defendants to return the Transfers or the value thereof, to the Trustee, together with prejudgment interest and attorneys' fees.

**SIXTEENTH CAUSE OF ACTION**
**Disallowance of All Claims**
**(11 U.S.C. §§ 502(d) and (j))**
**(Against All Defendants)**

393.    Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 392 of this Complaint as if fully set forth at length herein.

394.    The Defendants are transferees of transfers avoidable under sections 547 and/or 548 of the Bankruptcy Code, or Sections 273-275 of the New York Debtor and Creditor law, which property is recoverable under section 550 of the Bankruptcy Code.

395.    None of the Defendants have paid the amount of the Transfers, or turned over such property, for which Defendant is liable under Section 550 of the Bankruptcy Code.

396.    One or more of the Defendants may have asserted one or more claims against the Debtor's estate.

397.    Pursuant to Section 502(d) of the Bankruptcy Code, any and all claims of the Defendants and/or their assignees, against the Debtor's chapter 7 estate or the Plaintiff must be disallowed until such time as each Defendant or the Defendants pay to the Plaintiff an amount equal to the aggregate amount of the Transfers, plus interest thereon and costs.

398.    Pursuant to Section 502(j) of the Bankruptcy Code, any and all claims of the Defendants, and/or their assignees, against the Debtor's chapter 7 estate or the Plaintiff previously allowed by the Debtor or by the Plaintiff, must be reconsidered and disallowed until such time as each Defendant or the Defendants pay to the Plaintiff an amount equal to the aggregate amount of the Transfers.

**WHEREFORE**, the Trustee respectfully requests that a judgment or judgments be entered against the Defendant(s) as follows:

i.    On Counts One and Two, a judgment against Defendant Narinder, pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550 avoiding the SBA Loan Transfer to Narinder, directing the SBA Loan Transfers to Narinder be set aside, and directing Defendant Narinder to return to the Debtor's estate the amount of the SBA Loan Transfer to Narinder, plus interest at the maximum legal rate and to the fullest extent allowed by applicable law, together with the costs and expenses of this action, including, without limitation, attorneys' fees;

ii.   On Count Three, a judgment against Defendant Narinder, pursuant to 11 U.S.C. §§ 547 and 550 avoiding the SBA Loan Transfer to Narinder, directing the SBA Loan Transfer to Narinder be set aside, and directing Defendant Narinder to return to the Debtor's estate the amount of the SBA Loan Transfer to Narinder, plus interest at the maximum legal rate and to the fullest extent allowed by applicable law, together with the costs and expenses of this action, including, without limitation, attorneys' fees;

iii.  On Counts Five and Six, a judgment against Defendants KCM Family and/or Mehta, pursuant to 11 U.S.C. §§ 544, 548(a)(1)(A) and 550 and NYDCL §§ 272 – 279, avoiding the KCM Family Fraudulent Transfers, directing the KCM Family Fraudulent Transfers be set aside, and directing Defendants KCM Family and/or Mehta to return to the Debtor's estate the amount of the KCM Family Fraudulent Transfers, plus interest at the maximum legal rate and to the fullest extent allowed by applicable law, together with the costs and expenses of this action, including, without limitation, attorneys' fees;

iv.   On Counts Four, Seven, Eight, Nine, Ten, Eleven, Twelve, Thirteen and Fourteen, a judgment against Defendants Pritam, KCM Family, Mehta, Poola, Catalyst Business, Park Hillside, PK Business, Security Title and Silver Star and all Defendants, pursuant to 11 U.S.C. § 550 avoiding the Subsequent Transfers, directing the Subsequent Transfers be set aside, and directing Defendants to return to the Debtor's the amount of the Subsequent Transfers, plus interest at the maximum legal rate and to the fullest extent allowed by applicable law, together with the costs and expenses of this action, including, without limitation, attorneys' fees;

v.    On Count Fifteen, a judgment against all Defendants for unjust enrichment on account of the monies comprising the Transfers, in the amount for which each of the Defendants was enriched, which is collectively an amount no less than $2 million, and directing the Defendants to return the Transfers or the value thereof, to the Trustee, together with prejudgment interest and attorneys' fees;

vi.   On Count Sixteen, a judgment against all Defendants pursuant to 11 U.S.C. § 502 disallowing any claims held or filed by any of the Defendants against the Debtor or the Debtor's chapter 7 estate until the Defendant pays the full amount of any judgment granted in Plaintiff's favor; and

vii.    Granting Plaintiff such other and further relief as this Court may deem just and proper.

Dated:   New York, New York
            February 16, 2024

**KLESTADT WINTERS JURELLER**
**SOUTHARD & STEVENS, LLP**

By:   */s/ Kathleen M. Aiello*
        _____
        Fred Stevens
        Brendan M. Scott
        Kathleen M. Aiello
        200 West 41st Street, 17th Floor
        New York, New York 10036-7203
        Tel: (212) 972-3000
        Fax: (212) 972-2245
        Email: fstevens@klestadt.com
                 bscott@klestadt.com
                 kaiello@klestadt.com

        *Special Litigation Counsel to Yann Geron,*
        *Chapter 7 Trustee of the Estate of Jar 259*
        *Food. Corp.*